55 CCPA

**Carl W. WALTER, Appellant,**

v.

**George R. RYAN, Appellee.**

**Patent Appeal No. 7896.**

United States Court of Customs and Patent Appeals.

June 27, 1968.

Blair, Buckles, Cesari & St. Onge, Stamford, Conn. (John C. Blair, Stamford, Conn., Robert A. Cesari, John F. McKenna, Boston, Mass., of counsel) for appellant.

George E. Frost, Chicago, Ill., Robert L. Niblack, North Chicago, Ill., for appellee.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and KIRKPATRICK*, Judges.

RICH, Judge.

We unleashed this interference nearly seven years ago by our holding in the ex parte appeal, In re Walter, 292 F.2d 547, 48 CCPA 1094 (1961), that Walter's application contained support for a claim he had copied from Ryan patent 2,704,544, issued March 22, 1955, assigned to Abbott Laboratories, entitled "Venoclysis Equipment." Walter's assignee is Fenwal, Incorporated.

The Board of Patent Interferences decision of September 3, 1965, here on appeal, awarded priority of invention to Ryan, the senior party, on the ground that Walter had not proved that he either conceived the invention of the count or reduced it to practice prior to Ryan's filing date of October 5, 1949. The decision was thus rested entirely on priority proofs and the board found it unnecessary to decide other issues present in the case, such as the issue of support in Walter's application, on which we previously passed, which was again strenuously argued in the interference, and the legal contention that, under very complex prosecution circumstances, Walter cannot be said to have copied the claim within the year provided in 35 U. S.C. § 135(b). One member of the board, who was also the author of the board opinion, expressed his personal opinion on the last point saying section 135 had not been complied with.

The Walter application involved in the interference is serial No. 139,634, filed September 21, 1961.[1] Ryan is involved on his patent No. 2,704,544, issued on application serial No. 365,826, filed July 3, 1953.[2] Ryan's patent claim 1 is the count in interference.

Whether Ryan can keep claim 1, now patented to him since March 22, 1955, depends on whether Walter has proved, according to the standards of proof demanded in interferences, that he invented its subject matter prior to October 5, 1949, Ryan's earliest record date, within the terms of 35 U.S.C. § 102(g). This appeal is the latest episode in Walter's attempt to do so. We held in our 1961 decision that he had the right to an adjudication of the question of priority in the Patent Office because his application serial No. 487,728, parent of the application here involved, discloses subject matter on which Ryan claim 1 reads. Ryan is here arguing, inter partes, that we erred in that ex parte decision but we would get back to that question only if we found that Walter in fact and in law has now sustained the burden on him to prove prior invention. The board held he did not. We affirm,

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. This was a continuation of serial No. 487,728, filed Feb. 14, 1955, which was a division of serial No. 174,891, filed July 20, 1950, now Patent No. 2,702,034, issued Feb. 15, 1955. The application involved in our 1961 decision was No. 487,728.

2. This was a continuation of two applications, serial No. 119,645, filed Oct. 5, 1949 and serial No. 128,549, filed Nov. 21, 1949. It is not disputed that Ryan is entitled to the Oct. 5, 1949, filing date for the count.

though not necessarily on all of the board's reasoning.

■ Though Ryan has a patent, the burden is on Walter to prove prior invention only by a preponderance of evidence since his application and Ryan's were copending. Weitzel v. Lacy, 39 F. 2d 672, 17 CCPA 943 (1930). Ryan's earliest record date is October 5, 1949, the filing date of his application serial No. 119,645, the earliest date Ryan relies on for a reduction to practice. Walter's earliest record date is the filing of his first application on July 20, 1950.

Walter's effort in this case has been to show various alleged actual reductions to practice prior to October 5, 1949. To follow his contentions, we need to explain briefly the nature of the invention of the count and the general background of the development carried on by Walter with the help of various associates and contractors in the course of which he claims to have reduced the invention of the count to practice in various ways.

Walter's patent No. 2,702,034 which issued Feb. 15, 1955 on some of his inventions, and which we held in 1961 discloses the subject matter of the count, its disclosure in this respect being substantially the same as that of the application, is entitled "Apparatus for and Method of Collecting, Storing, and Dispensing Whole Blood." The collecting is done from a blood donor, the blood is stored in a plastic bag, and it is dispensed from the bag to a recipient through what is known as a "recipient set" consisting of a hollow needle or cannula to be inserted into the plastic bag, a short tubing connecting that needle to a filter chamber, and a longer tubing connecting the filter chamber to a venoclysis needle in the recipient's vein. Ryan's patent is entitled "Venoclysis Equipment," venoclysis being defined as "injection of food or drugs into a vein."[3]

The term obviously is inclusive of the injection of blood, or components of blood. We are here concerned only with a very small portion of the total apparatus, namely, the filter chamber in the recipient set, but its functioning within the intent of the count is tied in with the functioning of the whole apparatus. As we said in our 1961 opinion, "This filter cell is really of the utmost simplicity."

■ Walter suggests that the filter device is so simple that its actual reduction to practice can be established merely by showing that it was constructed. We disagree with that view, however, and are of the opinion that it is also necessary that it shall have been tested successfully in the intended use contemplated by the count in accordance with the usual rule. See Conner v. Joris, 241 F.2d 944, 44 CCPA 772 (1957), and cases therein cited, for the principles of law to be applied. The record convinces us beyond question of the necessity of practical tests. There are a variety of factors which produce unexpected results even with so simple a device among which may be mentioned the subjection of the apparatus to sterilization by steam and to pressures, both positive and negative, during use, and the behavior of blood in the apparatus. The development of the apparatus to a practicable workable stage does not appear to have been an easy matter and there were many failures. Actual reduction to practice can therefore be shown only by successful testing, under conditions of actual intended use or closely approximating those of actual use.

Shown below for illustration are part of Walter's Fig. 1 of Patent No. 2,702,034, depicting the donor equipment or set "A" having the blood-receiving bag 10; Fig. 7 of said patent (corresponding to Fig. 4 of the application in interference), showing the recipient set "B" coupled to bag 10 to deliver blood into the vein of the arm of a recipient through needle 50; his patent Fig. 4 (corresponding to application Fig. 2) showing details of the filter chamber 42, also shown in Fig. 7; and Fig. V of

3. Gould's Medical Dictionary, 5th Ed., 1941.

Ryan's patent showing one of several filter chambers he discloses in support of the claim of his patent which was copied to become the count in interference.

C. W. WALTER

APPARATUS FOR COLLECTING, STORING, AND
DISPENSING WHOLE BLOOD

2,702,034

G. R. RYAN

VENOCLYSIS EQUIPMENT

2,704,544

Fig.I

Fig.8

Fig.4

Fig.Y

Plastic bag 10 is shown flatwise and empty in Fig. 1 while in Fig. 7 it is shown edgewise and full. The filter chamber 42 of Fig. 4 is seen from the side in Fig. 7 wherefore it appears somewhat tapered toward the top and bottom, being made from a piece of cylindrical plastic tubing pinched together and heat-sealed at top and bottom as shown in Fig. 4. The recipient set "B" is coupled to bag 10 as shown in Fig. 7 by inserting a needle 47 having hub 46 into tube 16 which is sealed into the bag, protective sheath 17 (Fig. 1) having been partly cut away. It is worth noting that all of these Walter patent drawings must have been prepared sometime after November 10, 1949, when the patent lawyer was first asked to prepare an application, subsequent to Ryan's October 5, 1949 filing date. There are no such drawings of proven earlier date in evidence.

Referring to Fig. 1, an important aspect of Walter's system and apparatus was the collection of blood from a donor by passing it through a column 20 of ion exchange resin 21. This column was, like the rest of the apparatus, made of plastic such as polyvinyl chloride. To keep the ion exchange resin in place, a filter of nylon bolting cloth secured be-

tween hoops 24, 23, 24' was positioned in the bottom of the column. The purpose of the ion exchange resin column was to remove calcium from the blood by ion exchange to prevent coagulation or clot-ting, this being a proposed substitute for solutions previously added to the blood for that purpose. Decalcified blood flowed from column 20 into initial-ly empty, flat bag 10 through tube 13 having the loose knot 13b. When the bag was full, knot 13b was tightened as shown in Fig. 7, tube 13 being severed above the knot and the suspension connection 15 also being cut. The bag could then be placed in a blood bank for later use. To use the blood, the needle 47 of recipient set "B" was plugged into the tube 16 and blood could flow to a re-cipient through filter chamber 42, tube 40, and needle 50.

Filter chamber 42, Fig. 4, the only matter here involved, is a simple little device which turned out to be a difficult item to develop to a practical state, even the one here shown having been shortly abandoned for different and better con-structions. As shown, it consists of a body of tubular plastic connected at its ends to small tubing 40 and 45 by heat-sealing at 43 and 44. Frictionally en-gaged by the wall of the body is a filter 48 of nylon mesh held between a pair of hoops which gave this structure the name of the "embroidery hoop" device.[4]

Turning now to Ryan, Fig. V, he too was making plastic apparatus. It is of interest that these parallel developments by Walter and Ryan were directed to-ward the elimination of glass bottles for

blood handling, it having been learned that contact with glass has a deleterious effect on blood whereas appropriate plastic formulations do not. Further-more, a plastic bag can be made entirely devoid of air, simply by collapsing it and sealing it before filling. It expands as blood flows into it, thus eliminating con-tact of the blood with air. The plastic equipment was intended for single use, is more compact, weighs less, is less breakable and has other advantages. This development was carried on with financing from the American National Red Cross in connection with the im-provement and expansion of its blood bank program, to which Dr. Walter act-ed as a consultant.[5] Ryan's plastic filter chamber is described as having a resil-ient main tube portion 12 of plastic ma-terial, resilient plastic annuli 16 cement-ed into its ends, a length of tubing 14 sealed in one annulus with an end 50 ex-tending a short distance therethrough. A small woven plastic bag 52 is fastened over the tube to act as a filter. In the other end there is a stiff cannula 10 by which connection would be made to a blood container. The dotted lines 12 show how the chamber wall can be par-tially collapsed by squeezing it. Of this feature, Ryan says:

The main tube portion 12, being re-silient, is capable of collapsing under external pressure so as to act as a pressure bulb.

This is important especially in blood transfusion where the blood frequent-ly clots even though an anticoagulant has been used. The clots, if large

4. In case some younger generation reader has never seen a grandmother doing em-broidery with the use of embroidery hoops and wonders what they are, they are de-fined in Webster's New International Dic-tionary, 2d Ed., as follows:
A frame of two hoops, one fitting tightly over the other, in which ma-terial is held taut while it is being embroidered.

5. Dr. Carl W. Walter, born Nov. 30, 1905, to whom we refer simply as "Walter," is a man of numerous attainments and in-terests: Harvard A. B., cum laude, 1928. M. D. 1932; Surgeon, Peter Bent Brig-ham Hospital, Boston; Associate Clinical Professor of Surgery, Harvard Medical School 1953—; President, Fenwal Incor-porated 1941—; Technical Director, Bos-ton Blood Donor Center, American Red Cross 1941-1945; Member, Council of the Massachusetts Medical Society for Super-vision of Red Cross Blood Program; Vice President and Director of Research, Fen-wal Laboratories, Framingham, Mass., to mention some of the more relevant con-nections.

enough, will seal or plug the withdrawing cannula, however, using a device according to the invention, the tube portion 12 may be squeezed (indicated in dotted lines in Figure V) to exert pressure back through the cannula 10, thereby unplugging the cannula. Obviously, to prevent the pressure from entering the patient's vein, the tubing 14 should be closed while collapsing the cell.[6]

Ryan's patent claim 1, copied by Walter, now the single count in this interference, broken up by us into its clauses which we have numbered, is as follows:

A filter cell for venoclysis apparatus, comprising in combination:

■ a deformable, cylindrical, hollow body CAPABLE OF BEING PARTIALLY COLLAPSED WHEN EXTERNAL PRESSURE IS APPLIED THERETO TO EFFECT A SUBSTANTIAL CHANGE IN THE VOLUME OF THE SAID HOLLOW BODY AND RETURNING TO ITS ORIGINAL FORM WHEN THE PRESSURE IS RELEASED;

■ a filter element in said body;

■ end closure means at each end of said body having a passage therethrough;

■ a tubular inlet means communicating with the interior of said body secured to and projecting from one of the said closure means for communication with a source of liquid;

■ and tubular delivery means communicating with the interior of said body secured to and projecting from the other of the said closure means for discharging liquid from the said body;

■ said body when compressed after stopping the flow of fluid in the tubular delivery means effecting a back-flow through the said tubular inlet means, thereby facilitating dislodging obstructions in the said tubular inlet means.

Walter's proofs as to what he did in the course of making his inventions include over 700 pages of recollection testimony by several witnesses, including himself, dozens of physical exhibits and numerous paper exhibits all covering primarily a period from mid-1948 to mid-1950 and the evolution of the entire plastic system, much of the evidence relating to parts other than the filter chamber, with which we are not concerned. Walter builds his case for priority primarily on his alleged possession and use of four very different filter chambers summarized in his brief as follows:

I. The plastic bulb filter chamber (XW–45)

II. The "Japanese lantern" (XW–28)

III. The Manwaring-Gladu filter chamber (XW–35)

IV. The embroidery hoop filter chamber (XW–34, XW–57)

Before separately considering these items, we make the following general observations. Items I and II were considered in detail by the board and found not to have been proved to be actual reductions to practice. The board does not appear to have given specific consideration to items III and IV and Walter, in this court, while arguing that they meet the count, significantly makes no contention that these items were early enough to overcome Ryan's filing date. Indeed, Walter's record devotes a lot of space to carrying his story far into 1950 and beyond to show how it all had a happy ending commercially. But no evidence of events subsequent to October 5, 1949, is of any consequence here absent

---

6. Much dispute exists in this case, as it did in the one we had in 1961, by reason of the fact that Walter's patent applications and patent contain no express disclosure of this function of the chamber in dislodging clots from the entrance to the filter chamber. For whatever reason, it was apparently not deemed of importance to the inventions which Walter was trying to patent, even though the *apparatus* he disclosed may have been capable of performing the function.

a clear argument that Walter's diligence up to his filing date is relied on. We find no such argument. All we find on diligence is a single paragraph in Walter's brief, eighteen lines in length, which cannot be considered as a serious attempt to establish the diligence which the case calls for. In the absence of an adequate presentation of a case for diligence and in the absence of clear contentions that items III and IV antedated Ryan, which they apparently did not, we dismiss them from further consideration. At oral argument item I was touched upon and left to the briefs but the serious emphasis was all placed on item II.

### I. The Plastic Bulb Filter Chamber (XW–45)

"XW–45" stands for Walter exhibit 45 (W–45). It is supposed to represent something Walter himself made in mid-1948, not in connection with the plastic blood bag work or the plastic recipient sets developed therewith but to solve a problem with glass bottles containing stainless steel filters which got clogged *inside the bottles.*

Walter's own testimony in chief was that he conceived a solution to this problem. He said, "The solution was to put a compressible bulb on the discharge tube in the recipient line much as the 19th Century Higgenson Syringe Technic." His brief here says, "When squeezed, the bulb developed internal pressure causing backward flow to the bottle and filter * * * readily dislodging the clots * * *. These squeezable bulbs resumed their original size and shape when released * * * as specified in the count in interference. The plastic bulbs of Exhibits XW–21 and XW–45 * * * are typical of Dr. Walter's 1948 bulbs * * * and are likewise squeezable and self-restoring * * *."

Exhibit W–45 was originally numbered W–21–B and W–21 was originally W–21–A. They were a pair of similar articles and had a similar origin. They were not made in 1948 and they were not made by Walter. They were made many years later, without any instruction from him, at the request of Walter's then attorney, Robert Townsend, in connection with a suit entitled Abbott v. Fenwal (the two real parties in interest here), in the District Court for the District of Massachusetts (No. 56–231–F). They were apparently made in 1956 or 1957, Walter did not know just when, or know how they were made, or of what material they were made, and he explained that they were presented to him by the attorney during the taking of a deposition: "he asked me whether these were reasonable but crude likeness of the hand-blown recipient sets that I had made in June of 1948 [this was 8 or 9 years after the event], and I examined them and I agreed that they were reasonable but very crude likenesses, and that is the first time I saw them, and that was my description of them. And they were rigged with the bushing and the filter and the needles and the tubing, as you see them here."

Before quoting the next part of the testimony on cross-examination, we explain that a "Fenwal set" is shown by the record to be the *glass* blood bottle *inside which* is a stainless steel filter, as mentioned above, this alleged effort of Walter's in 1948 being to dislodge clots from that filter. His testimony proceeds:

XQ276. And as to the filter, you, in fact, used the filter in the original Fenwal sets as I understood at that time? A. That is correct.

XQ277. So the filter wasn't there in the originals [of W–21 and W–45]? A. That is correct. The filter was not there in the originals because the filter in the originals was a stainless steel filter inside the bottle.

Now, if W–45 on which Walter's brief now relies for an actual reduction to practice in 1948, in which there *is* a filter placed there, however, in 1956 or 1957, is unlike the "originals" made in 1948 in that the originals contained no filter, that is dispositive of the matter. A filter is an essential element of the

count and the originals, as Walter described them, could not be reductions to practice.

Having read the arguments and counterarguments in the multitudinous briefs and analyses of briefs, we have found no reason to disagree with the following conclusion of the board as to this item "I" plastic bulb:

> *Walter testified* repeatedly *that the bulb contained no filter,* but was squeezed *to free the stainless steel filter inside the blood bottle* [citations to testimony].

\* \* \* \* \* \*

We conclude that Walter's contention that the mid-1948 bulbs and their use constituted a reduction to practice is not only unproved but plainly untrue, since there was no filter within the bulb.

In conclusion on this point, we observe that the oral testimony on this item is all based on mere recollection of events which allegedly occurred 15 years earlier, no contemporary records identifying the structure of the plastic bulbs were produced, no contemporary objects exist, and there are serious conflicts in the testimony of the various witnesses relied on. We find such testimony as the party Walter gave about later bulbs in December 1948 having filters, like W–45, to be uncorroborated. Corroboration is essential. Testimony as to the *dates* of past events is in such conflict as to cast doubt on whether the year was 1948 or 1949. Even assuming existence of a plastic bulb with a filter, we find no credible evidence of satisfactory testing under conditions of actual use prior to Ryan's filing date. Reduction to practice of item "I" has therefore not been proved and the board must be affirmed on this point.

## II. The "Japanese Lantern" (W–28)

Appellant has clearly put his major effort into proving reduction to practice by this item. Unlike item "I", just discussed, this item was directly related to the plastic blood bag development as a part of the recipient set that went with this all-plastic system which was eventually described in Walter's patent application here involved and in his patent from which we took the drawings reproduced above.

The Japanese lantern was, according to the record, the first filter chamber developed for this new system and it was abandoned at an early date in favor of later improved designs, a later one of which is the one illustrated in the application at bar and its parents. That, too, was later replaced by a still more reliable design so that what we are here concerned with is not the filter disclosed in Walter's applications but its earliest progenitor. Consequently, this is not the filter chamber we considered in our prior decision. In the earlier case we knew nothing of the Japanese lantern. So the reader may know what we are talking about, we reproduce a drawing from Walter's brief giving an idea of what this filter looks like and why it acquired its name.

The "Japanese Lantern" Filter Chamber

The "Japanese Lantern" Filter Chamber

The numerals placed on the drawing are used by Walter in his brief to tie it to elements of the interference count, as follows:

(1) a deformable, cylindrical hollow body

(2) a filter element

(3) end closure means

(4) a passage

(5) end closure means

(6) a passage

(7) inlet means

(8) tubular delivery means

Unlike the filter chamber shown in Fig. 4 of the patent, supra, which is made of extruded plastic tubing 0.5 mm. thick with an inserted, rigid "embroidery hoop" filter element, the tubing being heat sealed at its ends by being pinched flat, the above lantern filter is completely fabricated from thinner polyvinyl chloride sheet stock. We have as exhibits four of these lantern chambers. They are not reproductions but originals, though there is some question, due to clear conflicts in the testimony, about when they were made and who made them. Walter testified they were from the first group of about a dozen made by Electronic Wave Products, in New York, and a Mr. Loman, one of their employees, testified to making such chambers, telling how he made them. The ends 3 and 5 were first made by sealing tubing into sheet stock. The two cylindrical side-walls 1 were made by forming circular bands by heat-sealing, the seams of which show in the articles but not in the drawing. These bands were heat-sealed to the ends 3 and 5 in a cylindrical tool, leaving the flash which shows in the drawing, and the two bands were also similarly sealed to opposite sides of a piece of fabric such as nylon bolting cloth, which is the median filter element 2. The thickness of the plastic of which these lantern chambers are made appears to be about the same as the thickness of the blood bags, many of which are in evidence, some having been made at the same place and time, according to Walter.

In his patent and applications Walter disclosed that his filter chamber had a wall thickness of 0.5 mm. and the bag 10 a thickness of only half that, or 0.25 mm. The diameter of the lantern chambers is 1 inch, compared to the diameter of the filter chamber disclosed in the application of "about 12 mm.", which is less than half an inch (0.4724"). In consequence, the lantern chambers are relatively thin-walled, more flexible, and appropriately described as flimsy, though when pinched when under no pressure other than atmospheric, both inside and outside, they return to their original rough shape when released. The board described the filter chamber as "limp."

After a lengthy consideration of Walter's testimony, the testimony of his corroborating witnesses, Ryan's answers thereto, and the limitations of the count, all with respect to the Japanese lantern filter chamber, the board concluded:

> Pursuant to the foregoing discussion we hold that Walter has not proved that he either conceived the invention or reduced it to practice prior to Ryan's filing date of October 5, 1949. Priority will accordingly be awarded to Ryan.

We are in agreement with the board's award of priority and with the finding that Walter has not adequately proved reduction to practice through the evidence relating to the Japanese lantern filter chamber for the reasons hereinafter stated.

Having reviewed the evidence ourselves, we are not persuaded that the lantern chambers—assuming Walter's possession of them on January 3, 1949, as he testified—have been shown to have been satisfactorily tested. In the first place, the evidence shows that there was a lot of trouble with this filter chamber which led to its ultimate total abandonment. There was trouble sealing the filter cloth into the plastic and with leaking at that joint.[7] The

---

7. We note that there was a similar early filter construction in the bottom of the ion exchange resin tube, Fig. 1 at 20, supra, the filter being at 23, 24, 24', to keep the resin out of the blood bag, including a portion of the resin of small particle size referred to as "frass" which sometimes did get through, creating a filtration prob-

documentation in respect of alleged reductions to practice during 1949 has to do with appearances and demonstrations of Dr. Walter at various meetings. While the *dates* of the meetings may have been established satisfactorily, the *documents* do not say anything about the *equipment* used. We do not find the witnesses' purely recollection testimony of events fifteen years earlier to establish with sufficient certainty that the Japanese lantern filter chamber was actually used or that, if used, it functioned satisfactorily. In fact, the testimony about the two earliest demonstrations tends to show that something went wrong. Witnesses who were supposed to corroborate the reductions to practice exhibited inability or lack of opportunity to observe accurately, or to remember definitely, and one "remembered" seeing lantern chambers before the date when Walter claimed to have received the very first ones. Certain little dramatic episodes relied on may have fixed the *meetings* in witnesses' minds but we see no reason why they would have fixed the use of any particular recipient set filter. Recipient sets were standard equipment before this invention was conceived. Without them, blood is not administered.

Perhaps a more significant reason why we find no reduction to practice through the use of Japanese lantern chambers is this: We do not consider their mere use in a recipient set to have been a reduction to practice *of the count*. Ryan makes this contention with great force and Walter counters with the argument that Ryan would have this court disagree with its own 1961 decision that the count is supported in Walter's application. This does not necessarily follow. While we might change our minds in the light of evidence of tests introduced by Ryan showing facts which were not previously available to us, we do not have to go that far. The Japanese lantern filter chamber, now claimed to be a reduction

to practice of the count, was not before us in 1961. In previously passing on support for the count we based decision on the chamber *disclosed in Walter's application*, not on the Japanese lantern. As suggested above and as may be seen from the descriptions, the lantern chamber is something quite different from the filter in the application. By the same process of reasoning which led us to find support in the application, we are now led to hold that the lantern chamber does not support the count. It cannot, therefore, be a reduction to practice. In the light of tests by Ryan which tend to show with persuasiveness that under conditions of actual use the lantern chamber collapses when there is a stoppage at the cannula connecting the filter chamber to the blood bag, due to the negative pressure caused by the flow of blood away from the filter to the recipient, we consider that the lantern chamber is not such structure as will function as the count requires.

As we read the count—and as we have always read it—it calls for a filter cell *capable* of doing certain things *in use*, by which we mean during delivery of fluid during venoclysis as normally performed. It calls for "venoclysis apparatus" and in clause [6] refers to compression of the chamber "after stopping the flow of fluid in the tubular delivery means" to effect "a back-flow through the said tubular inlet means" to dislodge obstruction. This requires a sufficient strength in the chamber wall not to collapse under the negative pressure which may develop in use upon the occurrence of a stoppage so that there is at that time a chamber which the operator can collapse—not a chamber which has already collapsed. This we do not believe the Japanese lantern chambers have, due to their limp, flimsy wall structure. Therefore they do not constitute reductions to practice even if they were used at some time actually to filter blood— perhaps only to remove "frass" from it.

lem for the recipient set filter having nothing to do with clotting of blood or the necessity of clearing the cannula in the

blood bag, the "tubular inlet means" of the count, of obstructions.

It is quite conceivable that these filter chambers could have been used by Walter and his associates in *his* plastic bag apparatus without evidencing this collapse under negative pressure for the reason that the total apparatus included as an important feature the ion exchange resin column the purpose of which was to prevent the clotting of the blood. At one point Walter testified, with respect to apparatus using filter sets of later design, "These filter sets using ion exchange blood were perfectly adequate *because there were no clots in the blood* and it went through usually as rapidly as the clinician had courage enough to infuse it." (Our emphasis.) At another point he said: *"Our problem* in the recipient set for this kind of blood, therefore, *was not the removal of clots,* as in conventional anti-coagulated blood, but we needed a very fine recipient set to be absolutely sure that none of the frass which might have escaped from the ion exchange column got into the patient's vein." (Our emphasis.) In the work he was doing, therefore, at the time when he said he was using Japanese lantern filters, he was not concerned with the problem of removing clots from the inlet tube and was not developing a chamber with the capacity of "pumpability," as the parties have called it, by which clots could be dislodged. There was therefore no reason to expect that they had that property or to suspect Ryan's evidence that they did not have it. Even when he came to disclose a filter chamber which we held had the capability, he did not think it significant enough to mention.

The board did an apparently careful job of evaluating a very long and complicated record and rendered a detailed opinion. We have seen no reason to discuss the evidence in equal detail since our own review has shown that its conclusion was correct, wherefore it is affirmed.

One matter remains. Appellee has caused some two hundred pages of material to be added to the printed record. Appellant has filed a motion to tax the costs of printing this additional material against appellee. On review of the material we found approximately half of it germane to the issues on appeal. The other half has been unnecessarily included. We, therefore, tax half of the additional printing costs against appellee.

Affirmed.